JUDGE LIMAN

**21 CV 04411**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVRYTHNG LIMITED,<br><br>    Plaintiff,<br><br>-against-<br><br>AVERY DENNISON RETAIL INFORMATION SERVICES, LLC and AVERY DENNISON RFID COMPANY,<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff EVRYTHNG Limited ("EVRYTHNG" or "Plaintiff") brings this action against Avery Dennison Retail Information Services, LLC ("RBIS") and Avery Dennison RFID Company ("RFID") (collectively, "Avery Dennison" or "Defendants"), and asserts claims for: (1) breach of contract; (2) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; and (3) unfair competition under New York common law. EVRYTHNG seeks remedies against Defendants including injunctive relief, compensatory and exemplary damages, and an award of EVRYTHNG's reasonable attorneys' fees and costs. In support of its claims and requested relief, EVRYTHNG alleges as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' misappropriation of EVRYTHNG's confidential, proprietary, and trade secret information relating to its world-changing technological platform in order to create a competing offering to unlawfully gain an unfair competitive advantage in the marketplace.

2. During the term of the agreements governing a collaboration between EVRYTHNG and RBIS, during which the parties had agreed not to use or disclose the other's Confidential Information to third parties, not to solicit business from the other's customers, and

not to compete with the other in the same business, Defendants abused the access that EVRYTHING had provided to its confidential, proprietary and trade secret information in order to act in their own self-interest by launching a competing platform that is a clone of EVRYTHNG's business in all but name. Defendant RBIS is the party that contracted with EVRYTHNG. Upon information and belief, Defendant RFID is the owner and operator of the competing platform and was provided EVRYTHNG's confidential, proprietary, and trade secret information by Defendant RBIS.

3. RBIS's actions constituted material breaches of the parties' agreements, and it failed to cure those breaches in response to EVRYTHNG's notice. Accordingly, the agreements were terminated as of May 14, 2021. Regardless of the termination of the agreements, RBIS is expressly prohibited from soliciting business from EVRYTHNG's clients and from competing directly with EVRYTHNG for a period of twelve (12) months. However, RBIS has made clear that it intends to continue soliciting business and competing with EVRYTHNG, using the platform built using the confidential, proprietary and trade secret information that it obtained from EVRYTHNG pursuant to their joint collaborative business efforts.

4. Accordingly, EVRYTHNG has commenced this action to enforce its rights under its agreements with RBIS as well as under applicable federal and state law with respect to Defendants' misappropriation of EVRYTHNG's confidential and trade secret information.

## **PARTIES**

5. Plaintiff EVRYTHNG Limited is a United Kingdom company with its principal place of business at 122 East Road, London 6FB, United Kingdom.

6. Defendant Avery Dennison Retail Information Services, LLC is a Nevada limited liability company with its principal place of business at 207 Goode Avenue, Glendale, California 91203. Upon information and belief, its sole and managing member is Avery Corp., a Delaware

corporation with its principal place of business at 207 Goode Avenue, Glendale, California 91203.

7. Avery Dennison RFID Company is a Delaware corporation with its principal place of business located at 207 Goode Avenue, Glendale, California 91203.

8. Avery Dennison Retail Information Services LLC and Avery Dennison RFID Company are wholly owned subsidiaries of Avery Dennison Corporation, a publicly-traded company on the New York Stock Exchange.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the trade secret laws of the United States, 18 U.S.C. § 1836 *et seq.*, and the Court possesses supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiffs' federal and state law claims derive from a common nucleus of operative fact.

10. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Plaintiffs are of diverse citizenship from all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged in this action occurred, or a substantial part of the property that is the subjection of this action, is situated in this judicial district.

12. Venue is also proper in this Court pursuant to Section 14.1 of EVRYTHNG's and RBIS's Services Authorisation and Form Agreement, as amended (the "Services Agreement"), which states, in pertinent part, "Any legal action or proceeding brought by either party relating to or arising out of this Agreement will be brought in a court of competent jurisdiction located in

3

New York and each of EVRYTHNG and Customer [RBIS] hereby submit to the non-exclusive jurisdiction of such courts in any such legal action or proceeding." Ex. A at 11.

## FACTUAL BACKGROUND

### I. EVRYTHNG IS A LEADER IN ITS INDUSTRY

13. Founded in 2011, EVRYTHNG is a market-leading Internet of Things[1] software provider and the inventor, owner, and operator of products such as the EVRYTHNG Product Cloud. EVRYTHNG was recognized as a "Technology Pioneer" in 2018 and a "Global Innovator" in 2020 by the World Economic Forum, ranked as one of the United Kingdom's top 50 most disruptive companies in 2019, and was the winner of the Fast Company World Changing Ideas award in 2020.

14. The EVRYTHNG Product Cloud is an innovative online platform that assigns physical products, such as footwear and apparel, a unique digital entity—an "Active Digital Identity" or "ADI"—that is accessible on the Internet. This "digital twin" enables both brands and customers to track, authenticate, and interact with an individual physical product throughout its lifecycle, providing unique and invaluable insights and opportunities with respect to their products.

15. Brands have traditionally used one type of identifier on a product (such as a standard barcode) to provide tracking through the supply chain and a second identifier to provide authentication of the product's origin. And customers would use a third identifier (such as a QR Code[2] and other AutoID technologies) in order to interact online with the company.

---

[1] The "Internet of Things" refers to "the networking capability that allows information to be sent to and received from objects and devices . . . using the Internet." *See* https://www.merriam-webster.com/dictionary/Internet%20of%20Things.
[2] A QR Code is a proprietary term referring to "a type of two-dimensional machine-readable code consisting of an array of black and white squares, typically used for storing URLs or coding

4

EVRYTHNG provides each individual product its own distinct Active Digital Identity in the EVRYTHNG Product Cloud and linked with a QR code or other type of identifier on the physical product item. When scanned, this Active Digital Identity can deliver information specific to that unique physical item covering all three use cases outlined above and customizable by the brand for its own and its customer's needs.

16. By combining these disparate sources of information into a single online digital identity, the EVRYTHNG Product Cloud unlocks substantial value to brands at all stages of a product's lifecycle, including (a) item-specific visibility throughout a sprawling supply chain to help reduce loss and increase shipping efficiency; (b) direct engagement with individual consumers on sustainability, provenance, and product sourcing, as well as targeted marketing; (c) product authentication, serving both the primary and resale market; and (d) information such as product composition and fabrics for recyclers that can reduce waste.

17. For example, the EVRYTHNG Product Cloud provides a world-renowned American fashion brand the ability to track each of its individual products throughout its supply chain from manufacture to customer purchase. Customers, upon scanning a garment's product label with their smartphone, are able to verify the garment's authenticity and learn about the product's materials and history through the product's connection with the EVRYTHNG Product Cloud.

18. The lifecycle of a "Born Digital" product, powered by the EVRYTHNG Product Cloud, is illustrated as follows:

---

information for reading by a camera phone." *See* https://www.oed.com/view/Entry/155604?redirectedFrom=qr+code#eid246543457.



19. As implemented by EVRYTHNG, a brand orders new products and unique digital identities are created for each individual item. Serialized labels – being labels with unique codes on each label – are manufactured, each associated with a different unique digital identity, and those labels are attached to the individual products during manufacturing. Once the labels are attached, the products are digitally activated and connected to their unique digital identity stored in the EVRYTHNG Product Cloud. Scanning these labels during shipment to distribution centers and dispatch to retailers allows brands real-time tracking information down to the individual product level using the digital identity. Customers can scan these labels in-store to unlock information such as product authentication and material sourcing or post-purchase for tailored experiences such as registration into a loyalty program, video content, and other manners

of consumer engagement through accessing the digital identity. To the extent the consumer places the product in the secondary market, resellers and buyers may scan the serialized labels to verify the product's authenticity using the digital identity and otherwise learn more about the product. Finally, at the end of the product's lifecycle, consumers and recyclers may scan the serialized labels yet again to learn about proper methods of recycling the product by accessing information from the digital identity in the EVRYTHNG Product Cloud.

20. EVRYTHNG has created various other innovative digital products as well, such as EVRYTHNG's Reactor, a Javascript-based rules engine which allows businesses to react to events such as product recalls by automatically identifying which unique items were part of a faulty batch and EVERYTHNG's Predictor, a machine learning engine that can predict whether an item is likely to be counterfeit, among others.

21. EVRYTHNG has pioneered a number of major industry developments. For example, EVRYTHNG chairs a working group for the global standards organization GS1 to improve the barcode standard managed by GS1, and EVRYTHNG has licensed patents it developed for use in conjunction with the new standard known as GS1 Digital Link.

22. EVRYTHNG's products and services are used not only in the footwear and apparel industries, but also the food and beverage, appliance and electronics, and toy and entertainment industries, among others.

23. EVRYTHNG offers its products and services throughout the Americas, the United Kingdom and the European Union, and China to clients in the apparel, footwear, health, beauty, consumer packaged goods, food, and beverage industries.

**EVRYTHNG Has Invested Significantly in Developing its Trade Secrets**

24. EVRYTHNG was conceived and developed beginning in 2008, when the idea of connecting physical objects to the Internet through the "Internet of Things" was barely

7

understood let alone as ubiquitous as it is today. The founders of EVRYTHNG recognized the potential for this technology to revolutionize industry and in creating EVRYTHNG pioneered an entirely new category of business.

25. In order to establish its business, EVRYTHNG has spent more than a decade and tens of millions of dollars, not to mention its sweat equity, in developing its trade secrets and confidential and proprietary information that set EVRYTHNG apart and makes it the leader in the marketplace. Among the trade secrets EVRYTHNG has developed are: (1) pricing for its platform, services and products (which are not available publicly but tailored to the customer based on a standard framework); (2) its product strategy and specific design for modules; (3) product and operational solutions for solving barriers to adoption across an array of complex supply chains and enterprise environments; (4) lists of current customers and targets, including customer acquisition strategies; (5) specific commercial growth strategies, roadmaps and future product development; (6) operating models and workflows, and business models to implement digital identity with various role players in the manufacturing, labelling and logistical process involved in making consumer products, and (7) analysis of potential competitors in the marketplace.

26. The research and development phase for EVRYTHNG was both lengthy and expensive. The company spent 2010 to 2011 researching and experimenting with different technologies prior to the formation of the business in early 2011 and raising external capital in late 2011. Then, from 2012 to 2013, EVRYTHNG invested approximately $2 million in the formulation of its core technology and various proof-of-concept projects with early customers. In mid-2013, EVRYTHNG began the process of raising additional investment capital to undertake further product investment so that EVRYTHNG could go to market. EVRYTHNG

successfully raised that capital, and by the end of 2014, had invested approximately $15 million into research and development.

27. This investment included not only research and development into EVRYTHNG's software technology and methods that form its core products and services, but also investment into market research so as to develop a workable business and pricing model, and to develop novel methodologies for linking digital identity with physical products in packaging and label processes used by manufacturers. At the time EVRYTHNG was conceived, the idea of mass scale product digitization and connection to the Internet was wholly novel. There was no business or pricing model to emulate, and the workflows and operating models to facilitate implementation needed to be formulated; accordingly, EVRYTHNG had to devise these solutions from scratch, considering how it would deliver value to customers, how much its services and technology were worth, and how both would interact with customer manufacturing costs and processes. EVRYTHNG experimented with several business and pricing models and invested significant resources into conceiving its current platform as a service (PaaS) subscription approach.

28. To date, EVRYTHNG has invested over $60 million in investment capital into developing its technology, products, business model, solution methodologies for customers, and in building awareness for the applications of the technology amongst consumer goods manufacturers.

**EVRYTHNG Diligently Protects its Trade Secrets and Confidential Information**

29. Because EVRYTHNG has expended substantial investment to develop its trade secrets and confidential information, EVRYTHNG takes significant steps to protect it.

30. EVRYTHNG takes many steps to ensure the security of its confidential,

proprietary and trade secret information. EVRYTHNG maintains an extensive Information Security program, which has been certified compliant with the requirements of ISO/IEC 27001:2013, an internationally recognized standard for information security.[3]

31. By way of summary (1) access to "Confidential," "Restricted" and "Internal Use" information is limited to those persons whose job require it or where allowed by contractual agreement; (2) access to any of these resources will be restricted by use of firewalls, network segregation, secure log-on procedures, access control list restrictions and other controls as appropriate; (3) EVRYTHNG enforces strong authentication and identity verification through strong password requirements and multifactor authentication; and (4) an information security policy that restricts and monitors access to the network and network services, as well as to EVRYTHNG's physical offices.

32. In addition, EVRYTHNG employees are required not only to undertake and complete information security training and agree to abide by its information security policies, but also are subject to non-disclosure and non-compete provisions in all employee contracts.

33. EVRYTHNG also protects its confidential, proprietary and trade secret information through its contracts with customers and partners. Any information that EVRYTHNG has classified as Confidential may be shared outside of the company only if subject to a non-disclosure agreement, even for early presale discussions. EVRYTHNG's standard customer engagement contains further confidentiality provisions and restrictions.

---

[3] IOS/IEC 27001:2013 is an informational security standard published by the International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC), which "specifies the requirements for establishing, implementing, maintaining and continually improving an information security management system within the context of the organization." *See* https://www.iso.org/standard/54534.html (last accessed May 8, 2021).

## II. EVRYTHNG'S COLLABORATION WITH AVERY DENNISON

34. Defendants are part of a Fortune 500 company, Avery Dennison Corporation, whose business encompasses providing retail branding and information services, including brand embellishments, graphic tickets, tags, labels, inventory accuracy, loss prevention, and brand protection. Avery Dennison Corporation is the global leader in the manufacture and sale of tags and labels with radio frequency identification (RFID), Quick Response or QR codes, and other bar codes, to businesses in the apparel and footwear industries, among others.

35. EVRYTHNG recognized the value that its platform could add to Avery Dennison Corporation's physical tags and labels and sought out to create a collaboration that would provide Avery Dennison Corporation with the EVRYTHNG Product Cloud and the parties would jointly market the benefits of imbuing Avery Dennison Corporation physical tags and labels with EVRYTHNG's digital identities and related service offerings.

### A. The Agreements Between the Parties

36. In the course of developing a collaborative relationship, EVRYTHNG and RBIS (which was the identified subsidiary for such a relationship) entered into three agreements designed to facilitate the sharing of information in furtherance of the joint efforts to build a go-to-market offering. First, the parties entered into a confidentiality agreement, consistent with EVRYTHNG's standard procedure for sharing its confidential, proprietary and trade secret information outlined above, that would facilitate the sharing of information in furtherance of the relationship with RBIS. Second, RBIS entered into a Services Agreement with EVRYTHNG pursuant to which RBIS purchased access to the EVRYTHNG platform and Active Digital Identities for its own limited operational use. Third, RBIS and EVRYTHNG entered into a Cooperation Agreement, which set forth the goals of the collaboration and the parties' respective obligations to each other with respect to competition and solicitation of business both during and

after the term of the agreement.

### 1. The Confidentiality Agreement

37. Because by virtue of this relationship EVRYTHNG would be providing RBIS with access to its most valuable assets (its trade secrets and confidential information), in order to protect the secrecy and confidentiality of this information, in October 2014, the parties entered into a Confidential/Nondisclosure Agreement, which the parties subsequently extended in 2019 through October 23, 2024 ("NDA"). A true and correct copy of the Confidential/Nondisclosure Agreement and subsequent extension are attached hereto as Exhibit B.

38. The NDA contemplates that the parties would share confidential information with one another. The confidential information EVRYTHNG intended to share under the NDA includes information relating to its ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ Ex. B § 1.

39. The NDA prohibits ███████████████████████ ███████████████████████████████████████████████ ███████████████████████████ Ex. B § 3.

40. The NDA also expressly prohibits ███████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████. Ex. B §§ 7, 20.

41. EVRYTHNG disclosed substantial confidential information to RBIS about its proprietary technology and business in reliance on, and subject to, the promises and obligations

contained in the NDA and subsequent extension.

### 2. The Services Agreement

42. As a first step in the collaboration, RBIS entered into an agreement with EVRYTHNG, the Services Authorisation Form and Agreement (the "Services Agreement"), with an effective date of March 31, 2015, pursuant to which EVRYTHNG agreed to provide RBIS with access to the EVRYTHNG platform. A true and correct copy of the Services Agreement is attached hereto as Exhibit A.

43. The Services Agreement states that RBIS sought to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. A at 3.

44. The Services Agreement ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. A § 3.2. The Services Agreement also makes clear that RBIS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. A § 3.2.

45. Additionally, the Services Agreement expressly restricts ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. A § 3.3.

46. The Services Agreement also sets forth strict confidentiality obligations. Section 8.3 of the Services Agreement provides that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▅▅▅▅▅▅▅ Ex. A § 8.3 (emphasis added). Section 8.3 continues by stating ▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ *Id.*

47. EVRYTHNG's "Confidential Information" is defined broadly under the Services Agreement to include, without limitation, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅. Ex. A § 8.1.

48. Underscoring the importance the parties placed on these confidentiality provisions, Section 14.12 of the Services Agreement expressly acknowledges that ▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅ Ex. A § 14.12 (emphasis added).

49. Section 14.12 continues by stating ▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ Ex. A § 14.12.

50. The Services Agreement also sets forth certain termination provisions. Relevant here, Section 10.2 provides that ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▮▮▮ Ex. A § 10.2.

51. Section 10.4 provides that, upon termination, each party ▮▮▮ Ex. A § 10.4.

   3.   **The Cooperation Agreement**

52. Finally, EVRYTHNG and RBIS subsequently entered into a Cooperation Agreement, effective January 31, 2016 (the "Cooperation Agreement"). A true and correct copy of the Cooperation Agreement is attached hereto as Exhibit C. The Cooperation Agreement indicates that the parties ▮▮▮ Ex. C § 1.

53. The Cooperation Agreement sets out the scope of the contemplated business relationship, through which ▮▮▮. Ex. C § 5.

54. The Cooperation Agreement also includes a revenue sharing schedule, through which ▮▮▮. Ex. C § 6(b); *see also id.* § 7 (▮▮▮).

55. Accordingly, the Cooperation Agreement represented a ▮▮▮

15

56. The Cooperation Agreement expressly ▮▮▮

▮▮▮ Ex. C § 9.

57. Significantly, recognizing that the purpose of the Cooperation Agreement was to ▮▮▮

58. Section 10 of the Cooperation Agreement provides, in pertinent part, ▮▮▮

▮▮▮ Ex. C § 10.

59. Section 11 of the Cooperation Agreement provides that, ▮▮▮ Ex. C § 11.

60. Significantly, ▮▮▮

16

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬. Ex. C § 11 ▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬.

**B.     EVRYTHNG's Efforts to Collaborate with RBIS**

61.     As envisioned by EVRYTHNG, the collaboration with RBIS was a huge opportunity for customers in the apparel and footwear industries who would be able to unlock the potential of the physical tags and labels RBIS was supplying while providing RBIS itself with a new angle into an emerging marketplace and the additional revenue stream. Customers who signed up to access EVRYTHNG's platform gained tracking and analytics capabilities throughout the supply chain (*e.g.*, anti-counterfeit, inventory management, loss prevention, and diversion alerts), the ability to provide direct to consumer services on an individualized product basis (*e.g.*, personalized rewards, product replenishment, targeted marketing campaigns, product reviews, product registrations, and information regarding, *inter alia*, the sourcing, manufacture, authenticity, and recycling of the product), and smart product control and connectivity.

62.     In marketing this offering to clients, RBIS referred to these new digital capabilities by the brand "Janela, powered by EVRYTHNG." *See* https://rbis.averydennison.com/en/home/our-solutions/apparel-and-footwear-branding/introducing-janela-smart-product-platform.html.

## Introducing Janela™

**The Future of Connected Products is Here**

Digitize and connect your products with Janela™.

Avery Dennison's Janela™ solution, powered by the EVRYTHNG Smart Products Platform, enables apparel and footwear products to have a unique, serialized label, which then connects to EVRYTHNG's IoT cloud-based software. That means every Janela™ product is 'born' digital with the ability to capture real-time data, enhance consumer experiences, and make the manufacturing and selling of products more efficient and intelligent.

Over three years, Avery Dennison will digitize a minimum of 10 billion apparel products for some of the world's leading brand and retailers, enabling personalized and relevant consumer experiences.

63. EVRYTHNG worked diligently to demonstrate the use cases for its technology to RBIS. In the years following execution of the Cooperation Agreement, EVRYTHNG explained to RBIS the confidential, technological intricacies of its platform, and shared with RBIS significant confidential business information including, but not limited to, pricing models, customer lists, apparel and footwear account targets, specific commercial strategies, including particular challenges EVRYTHNG was facing with respect to its platform and how it planned to overcome those challenges and grow its business, and specific information as to EVRYTHNG's competitors in the various aspects of its business. In other words, EVRYTHNG provided RBIS with all of the information that would be needed to replicate EVRYTHNG's technology without having to incur the significant investment of time and cost, and to compete with EVRYTHNG effectively in the digital identity space. At all times, EVRYTHNG shared such information pursuant to the restrictions of the NDA, Services Agreement, and Cooperation Agreement, trusting that RBIS would abide by its commitments not to use or disclose any confidential information received from EVRYTHNG except as permitted under the Agreements and would not solicit business from EVRYTHNG's clients or launch a competitive platform.

64. In addition to sharing confidential, proprietary and trade secret information with RBIS, EVRYTHNG also introduced its current platform customers to RBIS and discussed

potential targets, both from RBIS's current customers as well as the apparel and footwear industry at large.

65. EVRYTHNG successfully piloted its platform with a number of clients throughout the term of the Cooperation Agreement.

66. In 2018, a premier luxury apparel brand contracted with EVRYTHNG to provide Active Digital Identities for tens of millions of its products to provide traceability throughout the supply chain and allow both retailers and customers the ability to authenticate products and compete counterfeits. EVRYTHNG's platform would also allow this brand the ability to provide its customers additional information about the product and style tips and recommendations. This was the first global retail apparel brand to apply this technology at this scale.

67. EVRYTHNG worked diligently for months to solve the logistical difficulties to deliver its end-to-end solution on this massive scale. EVRYTHNG integrated the brand's enterprise systems into the EVRYTHNG Product Cloud platform, connecting order information and product items, providing real time analytics for factory visibility, item tracing, and consumer engagement.

68. . In addition Avery Dennison has benefited from sales of premium serialized tags used by the brand in conjunction with EVRYTHNG's Product Cloud.

69. Subsequent to the 2018 agreement with the premier luxury apparel brand, EVRYTHNG secured agreements with sportswear and lifestyle apparel brands involving similar

large-scale implementations of digital identity with their products and multi-year agreements. These agreements similarly involved RBIS providing premium serialized label tags to these customers. RBIS has received a share of EVRYTHNG's revenues from its work with these brands in accordance with the Cooperation Agreement.

### III. AVERY DENNISON MISAPPROPRIATES EVRYTHNG'S CONFIDENTIAL AND TRADE SECRET INFORMATION

70. Having demonstrated the business case through EVRYTHNG's major partnership, RBIS saw the value of EVRYTHNG's business. But rather than continue to partner with EVRYTHNG and comply with its obligations under the agreements, RBIS used the collaboration with EVRYTHNG to access EVRYTHNG's confidential, proprietary, and trade secret information in order to create a competing platform, atma.io ("Atma"), owned and operated by its sister company RFID, and to use EVRYTHNG's experience with their customers as evidence of Avery Dennison's capabilities. Atma is essentially a clone of EVRYTHNG's Product Cloud, which is unsurprising given that all of the RBIS employees who worked closely with EVRYTHNG were reassigned to develop Atma. And after announcing Atma, Avery Dennison has proceeded to claim credit for the work that EVRYTHNG provided to clients pursuant to their joint efforts.

#### A. Avery Dennison Palming Off EVRYTHNG's Work Product.

71. In late 2019 and continuing throughout 2020, Avery Dennison began claiming credit for the success of EVRYTHNG's products and offerings through the Janela brand. In numerous media interviews and promotional materials, Avery Dennison misrepresented that the digital identity capabilities supplied by EVRYTHNG were supplied by Avery Dennison, in an effort to palm off EVRYTHNG's work as its own.

72. For example, in an August 13, 2019 interview, Ms. Akari Shono-Price, Avery